Approved: [signature]
ELISHA J. KOBRE / MARTIN BELL
Assistant United States Attorneys

Before: HONORABLE STEWART D. AARON
United States Magistrate Judge
Southern District of New York

20 MAG 8898

| | | |
|---|---|---|
| UNITED STATES OF AMERICA<br><br>- v. -<br><br>SEPEHR SARSHAR,<br>a/k/a "Sep,"<br><br>Defendant. | : | **SEALED COMPLAINT**<br><br>Violations of 15 U.S.C. §§ 78n(e) & 78ff; 17 C.F.R. §§ 240.14e-3(a), 240.14e-3(d); 18 U.S.C. §§ 1343, 1348, and 2.<br><br>COUNTY OF OFFENSES: New York |

SOUTHERN DISTRICT OF NEW YORK, ss.:

BRANDON RACZ, being duly sworn, deposes and says that he is a Special Agent with the Federal Bureau of Investigation ("FBI") and charges as follows:

**COUNT ONE**
**(Securities Fraud)**

1. From in or about January 2015 through in or about September 2015, in the Southern District of New York and elsewhere, SEPEHR SARSHAR, a/k/a "Sep," the defendant, knowingly and intentionally executed a scheme and artifice to (a) defraud persons in connection with securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, and (b) obtain, by means of false and fraudulent pretenses, representations, and promises, money and property in connection with the purchase and sale of securities of an issuer with a class of securities registered under Section 12 of the Securities Exchange Act of 1934 and that was required to file reports under Section 15(d) of the Securities Exchange Act of 1934, to wit, SARSHAR carried out a scheme to defraud Auspex Pharmaceuticals, Inc. ("Auspex" or the "Company") by misappropriating, in breach of his duties to Auspex, material non-public Information ("MNPI") regarding a forthcoming

tender offer by Teva Pharmaceutical Industries Ltd. ("Teva") for all outstanding shares of Auspex (the "Tender Offer"), and passing that MNPI to his friends and a family member so that they could make profitable securities trades based upon that MNPI, and otherwise causing them to purchase securities based upon that MNPI.

(Title 18, United States Code, Sections 1348 and 2.)

**COUNT TWO**
**(Wire Fraud)**

2. From in or about January 2015 through in or about September 2015, in the Southern District of New York and elsewhere, SEPEHR SARSHAR, a/k/a "Sep," the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, SARSHAR carried out a scheme to defraud Auspex by misappropriating, in breach of his duties to Auspex, MNPI regarding the Tender Offer, and passing that MNPI to his friends and a family member so that they could make profitable securities trades based upon that MNPI, and otherwise causing them to purchase securities based upon that MNPI.

(Title 18, United States Code, Sections 1343 and 2.)

**COUNT THREE**
**(Fraud in Connection with a Tender Offer)**

3. From in or about January 2015 through in or about March 2015, in the Southern District of New York and elsewhere, SEPEHR SARSHAR, a/k/a "Sep," the defendant, willfully and knowingly engaged in fraudulent, deceptive, and manipulative acts and practices in connection with a tender offer, in that after an offering person had taken substantial steps to commence a tender offer, SARSHAR, while in possession of material information relating to such tender offer, which information he knew and had reason to know was non-public and which he knew and had reason to know had been acquired directly and indirectly from the offering person, the issuer of the securities sought and to be sought by such tender offer, and an officer, director, partner, and employee and other person acting on behalf of the offering person and such issuer, (a) purchased and sold, (b) caused to be purchased and sold, and (c) communicated such material, non-public information

under circumstances in which it was reasonably foreseeable that such communication would likely result in the purchase and sale of, such securities, without public disclosure by the purchaser or seller by press release or otherwise of such material, non-public information within a reasonable time prior to such purchase and sale, to wit, SARSHAR passed MNPI regarding the Tender Offer to his friends and a family member so that they could make profitable securities trades based upon that MNPI, and otherwise caused them to purchase securities based upon that MNPI.

(Title 15, United States Code, Sections 78n(e) & 78ff; Title 17, Code of Federal Regulations, Sections 240.14e-3(a) & 240.14e-3(d), and Title 18, United States Code, Section 2.)

The bases for my knowledge and the foregoing charges are, in part, as follows:

4. I am currently employed as a Special Agent with the FBI and have been for approximately five years. I am currently assigned to a squad responsible for investigating violations of the federal securities laws and related offenses, including insider trading. I have participated in investigations of such offenses, and have made and participated in arrests of individuals who have committed such offenses.

5. The information contained in this affidavit is based upon my personal knowledge, as well as information obtained during this investigation, directly or indirectly, from other sources and agents, including documents and information provided to me by the U.S. Securities and Exchange Commission ("SEC") and other business records. Because this affidavit is prepared for the limited purpose of establishing probable cause, I have not set forth each and every fact I have learned in connection with this investigation. Where communications and events are referred to herein, moreover, they are related in substance and in part. Where dates, figures, and calculations are set forth herein, they are approximate.

## RELEVANT ENTITIES AND INDIVIDUALS

6. At all times relevant to this Complaint:

a. Auspex was a biopharmaceutical company, headquartered in San Diego, California, which was focused on the development and commercialization of novel medicines for the treatment of so-called "orphan" diseases, which are diseases that affect fewer than 200,000 people annually in the United States.

Auspex common stock was traded on the NASDAQ, which is based in Manhattan, under the symbol "ASPX." Auspex's stock was registered under Section 12 of the Securities Exchange Act of 1934 and it was required to file reports under Section 15(d) of that Act.

b. Teva was a global pharmaceutical company, headquartered in Israel which focused, among other things, on producing generic medicines and treatments for disorders of the central nervous system. Teva's American Depository Shares[1] were traded on the New York Stock Exchange ("NYSE") under the symbol "TEVA."

c. SEPEHR SARSHAR, a/k/a "Sep," the defendant, was a founder of Auspex and was, beginning in or about September 2009 and at all times relevant to this Complaint, a member of Auspex's board of directors (the "Auspex Board of Directors"). From approximately January 2005 through September 2007, SARSHAR was President and Chief Executive Officer of Auspex. From approximately October 2007 to May 2009, SARSHAR was Chief Technology Officer of Auspex. As reflected in an SEC filing, SARSHAR was also the Manager of two venture capital firms (the "Venture Capital Firms") used to facilitate investments into Auspex before the company went public. SARSHAR received a B.S. in Chemistry and Mathematics from the University of California, Los Angeles ("UCLA") and a Ph.D. in Organic Chemistry from Harvard University.

d. "Associate-1" is a friend of SARSHAR's from UCLA and is a dentist and periodontist whose practice is based in Beverly Hills, California. Associate-1 attended the UCLA Dental School from 1988 to 1992 while also completing his Masters in Oral Biology from UCLA in 1992.

e. The "CW" was, during all periods relevant to this Complaint, a friend of both Associate-1 and SARSHAR. Specifically, from my interviews with the CW, I have learned that the CW and Associate-1 attended high school together and remained friends thereafter, and the CW met and became friends with SARSHAR during college. Both Associate-1 and the CW were early investors in Auspex before the Company went public.[2]

---

[1] American Depositary Shares are U.S. dollar-denominated equity shares of a foreign-based company available for purchase on an American stock exchange.

[2] The CW is cooperating in the Government's investigation pursuant to a non-prosecution agreement with the Government. Information

f. "Associate-2" was, during all times relevant to this Complaint, a girlfriend of SARSHAR's, who resided in Encinitas, California, which is in the vicinity of San Diego, California.

g. "Associate-3" is an individual who has been friends with SARSHAR since the mid-2000s.

h. "Associate-4" is an individual who has a close familial relationship with SARSHAR. During all times relevant to this Complaint, Associate-4 resided in New York, New York.

## SUMMARY OF SARSHAR'S MISAPPROPRIATION SCHEME

7. As set forth below, there is probable cause to believe that SEPEHR SARSHAR, a/k/a "Sep," the defendant, misappropriated MNPI from Auspex relating to Teva's anticipated tender offer for Auspex and passed that MNPI on to friends and family, including Associate-1, Associate-2, Associate-3, and Associate-4 (collectively, the "Associates") so they could execute profitable securities trades based on that MNPI, and otherwise caused the Associates to execute trades based on the MNPI he misappropriated. In turn, the Associates' trading in the shares of Auspex generated an aggregate of more than approximately $700,000 in illicit profits.

## SARSHAR'S CONFIDENTIALITY DUTIES TO AUSPEX

8. Based upon my review of documents submitted by Auspex to the Financial Industry Regulatory Authority ("FINRA"), which conducted an investigation into possible insider trading in Auspex stock in connection with the Tender Offer (the "FINRA Investigation"), and from records maintained by Teva, I have learned the following, in substance and in part:

a. Auspex maintained a series of company-wide policies to protect and maintain the confidentiality of business information, and to comply with applicable laws and regulations prohibiting insider trading. These policies, described in pertinent part below, included a Code of Business Conduct and Ethics and an Insider Trading Policy.

---

provided by the CW has proven accurate and reliable and has been corroborated by, among other things, records of electronic communications and brokerage records.

b. Auspex's Code of Business Conduct and Ethics (the "Code") contained a section titled "Confidentiality." This section provided, among other things, "[e]mployees who have received or have access to confidential information should take care to keep this information confidential."[3] The Code defines "confidential information" to include "business . . . plans" and "financial information." The Code further states that "[e]very employee has a duty to refrain from disclosing to any person confidential or proprietary information about us . . . learned in the course of employment here, until that information is disclosed to the public through approved channels. Unauthorized use or distribution of this information could also be illegal and result in civil liability and/or criminal penalties."

c. Auspex's Insider Trading Policy by its terms "applies to all directors, officers, other employees and consultants of the Company and its subsidiaries." The Insider Trading Policy provided, in pertinent part, "[i]t is illegal for anyone to use Inside Information to gain a personal benefit, or to pass on, or 'tip,' the information to someone who does so." Furthermore, the Insider Trading Policy states that "[y]ou may not discuss material, nonpublic information about the Company with anyone outside the Company" and "[y]ou may never recommend to another person that he or she buy or sell our stock." The Insider Trading Policy specifically defines Inside Information to include "potential mergers, acquisitions, [and] tender offers . . . ."

d. Auspex also required each of its employees to sign a confidentiality agreement when they were initially employed with the Company. From records provided by Teva, I have learned that an "Offer of Employment" letter agreement from Auspex to SEPEHR SARSHAR, a/k/a "Sep," the defendant, dated March 15, 2001, and signed by SARSHAR, states that, as a condition of SARSHAR's employment with the company, SARSHAR would be required to sign a confidentiality agreement.

e. On or about September 21, 2009, SARSHAR entered into a "Consulting Agreement" with Auspex. The Consulting Agreement, which SARSHAR signed as "Consultant," and which was for a term of two years, defines "Confidential Information" to include "all data, information . . . relating to the Company or its plans . . . business, financial" affairs furnished to Consultant by or

[3] The Code states that references to "employees" therein are "intended to cover officers and, as applicable, directors," and "[w]e expect every employee, officer and director to read and understand the Code and its application to the performance of his or her business responsibilities."

on behalf of the Company and provides that "[c]onsultant will not . . . (i) use the Confidential Information for any purpose whatsoever other than the performance of the Services on behalf of the Company or (ii) disclose the Confidential Information to any third party."

f. Each of Auspex's employees and consultants who were privy to information about the events leading up to the public announcement of the Tender Offer had previously agreed to abide by the confidentiality and nondisclosure agreements discussed above. Additionally, after individuals within the Company were apprised of the confidential information regarding the events leading to the public announcement of the Tender Offer, they were specifically reminded to hold that information in the strictest confidence in accordance with the Auspex's policies and non-disclosure agreements.

9. From my review of an e-mail sent by SEPEHR SARSHAR, a/k/a "Sep," the defendant, to the CW and other early investors in Auspex, on or about February 4, 2014, shortly before Auspex went public, I have learned that SARSHAR wrote "I will remain on the Board of Auspex after the IPO [Initial Public Offering] and as such I will not be allowed to communicate with anyone with regards to company matters that are not public knowledge."

**THE PUBLIC ANNOUNCEMENT OF THE TENDER OFFER**

10. From my review of a public filing by Auspex with the SEC, I have learned that, on or about March 30, 2015, Auspex and Teva issued a joint press release announcing publicly for the first time that Teva would commence a tender offer to purchase all of the issued and outstanding shares of Auspex common stock for $101 per share in cash (the "March 30 Press Release").

11. From my review of publicly available historical stock market prices for Auspex stock and data provided by the SEC, I have learned that the price of Auspex stock jumped from a close of $70.91 per share on Friday, March 27, 2015 to a close of $100.36 per share on March 30, 2015, the day of the March 30 Press Release. This represented a more than 41% jump in Auspex's stock price.

**SARSHAR LEARNS MATERIAL NONPUBLIC INFORMATION RELATING TO THE TENDER OFFER AND PASSES IT ON TO HIS FRIENDS AND FAMILY**

**SARSHAR Learns MNPI Regarding the Tender Offer and Passes it on to Associate-1**

12. From my review of documents publicly filed by Auspex with the SEC, phone records for cellular telephones used by SEPEHR SARSHAR, a/k/a "Sep," the defendant, Associate-1, and the CW, an e-mail account used by SARSHAR (the "Sarshar E-Mail Account"), an iCloud account maintained by the CW (the "CW iCloud Account"), and records from three securities brokerage firms ("Broker-1" through "Broker-3"), I have learned the following, in substance and in part:

a. On or about January 15, 2015, the Chief Executive Officer of Auspex (the "Auspex CEO") and representatives of Auspex's senior management met with representatives of Teva in San Francisco, California. At the meeting, the President of Global Research and Development and Chief Scientific Officer of Teva, for the first time, expressed an interest in a potential acquisition of Auspex.

b. In the following weeks, Auspex senior management held several in-person meetings and/or webcast calls with representatives of Teva to discuss a potential acquisition of Auspex by Teva.

c. On or about February 16 and 17, 2015, a meeting of the Auspex Board of Directors was held in La Jolla, California (the "February 2015 Board Meeting"). From records provided by Auspex to FINRA, I have learned that SARSHAR was present for both days of this meeting in his capacity as a member of the Auspex Board of Directors. During the February 2015 Board Meeting, the Auspex CEO, among other things, "updated the Auspex Board on . . . significant inbound interest in acquiring Auspex, including from Teva" and other companies. During the February 2015 Board Meeting, the Auspex Board also received presentations from two investment banks, and chose a particular investment bank (the "Investment Bank") to act as Auspex's financial advisor in any strategic transaction. The Auspex Board of Directors further authorized management to, along with the Investment Bank, contact several potential acquirers and discussed "a process for engaging with other potential acquirers, including Teva . . ."

d. On or about February 17, 2015, the second day of the February 2015 Board Meeting, Associate-1 and SARSHAR exchanged text messages. The two exchanged additional text messages the

following day, February 18, 2015. On or about February 20, 2015, Associate-1 purchased 500 shares of Auspex.

e. On or about February 24, 2015, Teva submitted to Auspex a non-binding proposal to acquire Auspex for a range of $85-$95 per share in an all cash transaction.

f. From my review of phone records for SARSHAR and records produced by Teva, I have learned that, on or about March 11, 2015, SARSHAR called into a conference line used by Auspex for meetings (the "Auspex Conference Line") for a call beginning at approximately 7:55 a.m. and lasting approximately 106 minutes, until approximately 9:41 a.m.[4]

g. On or about the same day, March 11, 2015, between approximately 12:14 p.m. and 12:17 p.m., SARSHAR and Associate-1 exchanged text messages. At approximately 1:33 p.m., SARSHAR called Associate-1 and the two were connected for approximately 3.5 minutes (the "March 11 Phone Call"). Following the March 11 Phone Call from SARSHAR to Associate-1, calls were placed from a phone number assigned to Associate-1's dental office to the CW, including a call at approximately 3:04 p.m. that lasted approximately five minutes.

h. From my interviews of the CW and my review of the CW iCloud Account, I have learned that, approximately two months earlier, on or about January 15, 2015, the CW created a note on his iPhone, which was saved to the CW iCloud Account titled "Auspex ASPX 2015, info needed" (the "Auspex Note").[5] From my interviews of the CW, I have learned that the CW recorded in the Auspex Note certain conversations between him and SARSHAR and between him and Associate-1 relating to the CW's investment in Auspex.

i. From my interviews with the CW and from my review of the Auspex Note, I have learned that, in a phone call on or about March 11, 2015, Associate-1 recounted to the CW a "[c]onversation between [Associate-1] and Sep" that day in which SARSHAR provided Associate-1 with confidential information regarding a possible tender offer for Auspex. This information included that the Investment Bank, which SARSHAR named, was

[4] Unless otherwise noted, all times referenced in this Complaint are in Pacific Time.

[5] From records provided by FINRA, I have learned that January 15, 2015, which is the date the Auspex Note was created, was also the same day SARSHAR first became aware of the potential tender offer by Teva.

"working on it," referring to a potential sale of Auspex; that Auspex was having "audits" done in anticipation of a possible sale of the Company; the price at which SARSHAR was willing to sell the Company; and that SARSHAR had told Associate-1 to "absolutely" buy more Auspex stock.

j. As set forth above, the Investment Bank named in the March 11, 2015 entry in the Auspex Note was, in fact, the investment bank retained by Auspex to act as Auspex's financial advisor in any strategic transaction. In addition, on or about March 10, 2015, the day before the March 11 Phone Call, Auspex's Chief Operating Officer e-mailed a representative of Teva as part of the parties' confidential due diligence process regarding, among other things, certain "audits" Auspex had scheduled.

k. From my review of records from Broker-1, I have learned that from on or about the following day, March 12, 2015, through on or about March 16, 2015, the CW purchased a total of approximately 1,100 shares of Auspex. From the CW, I have learned that these trades were based, at least in part, upon the confidential information about the Tender Offer SARSHAR had conveyed to Associate-1 on or about March 11, 2015, which Associate-1 had, in turn, provided to the CW.[6]

l. Following the March 11 Phone Call between SARSHAR and Associate-1, SARSHAR continued to engage in substantial communications with Associate-1. Among other things, on or about March 11, 2015, SARSHAR sent Associate-1 an e-mail with subject "Tomorrow" stating "Free to meet any time after 1pm tomorrow." The two thereafter exchanged e-mails about a possible meeting on March 12, 2015, though it appears no meeting ultimately took place. On or about March 13, 2015 and March 16, 2015, SARSHAR and Associate-1 exchanged additional text messages. As set forth below, these communications, as well as other communications between SARSHAR and Associate-1 described herein, contradict SARSHAR's subsequent statement to FINRA, through counsel, that he had no contact with Associate-1 between February 2, 2015 and March 27, 2015.

m. From records provided by Auspex to FINRA, I have learned that on or about March 17, 2015, the Auspex Board of Directors held a telephonic meeting (the "March 17 Board Meeting"), the purpose of which was to "update the Board on the status of the

[6] The CW also purchased approximately 225 shares of Auspex through the CW Accounts on or about March 10 and 11, 2015 before the March 11 Phone Call.

Company's ongoing discussions relating to a potential strategic transaction and to have [the Investment Bank] review the financial aspects of the proposals received by the Company." SARSHAR participated in this meeting. From my review of phone records for SARSHAR, I have learned that SARSHAR called into the Auspex Conference Line at approximately 4:56 a.m. and was connected until approximately 6:20 a.m. According to minutes of the meeting provided by Auspex to FINRA, "[a]fter considering the financial information reviewed during the meeting, the Auspex Board indicated that it would not be interested in selling Auspex for cash at less than the upper range of Teva's offer."

n. On or about March 17, 2015, at approximately 9:04 a.m., following the March 17 Board Meeting described above, SARSHAR called Associate-1 and the two were connected for approximately 13 minutes. From records provided by Broker-2, I have learned that, on the same day at approximately 10:41 a.m., a close family member of Associate-1's, who had not previously owned or traded in Auspex, purchased approximately 500 shares of Auspex stock.

o. On or about March 19, 2015, between approximately 7:36 a.m. and 5:25 p.m., SARSHAR and Associate-1 exchanged numerous text messages. At approximately 11:54 a.m., Associate-1 sent a text message to the CW stating "Aspx at all time highs. I think maybe next week it will $100." As noted above, eleven days later Auspex announced the Tender Offer under which Teva proposed to purchase all outstanding Auspex shares at a price of $101 per share.[7]

p. From my review of records from Broker-1 and Broker-3, I have learned that, between on or about March 26, 2015 and on or about March 27, 2015, the last business day before the March 30 Press Release, Associate-1 purchased a total of at least approximately 19,500 shares of Auspex stock. On or about March 31, 2015, the day following the March 30 Announcement, Associate-1 sold approximately 7,000 shares of Auspex stock at a price of approximately $100 per share and, pursuant to the Tender Offer, Associate-1 tendered the remaining 12,500 shares of Auspex stock (as well as additional shares from previous holdings), yielding a

[7] Moreover, from my review of historical price data for Auspex provided by the SEC, I have learned that Auspex stock closed at a price of $82.75 per share on March 18, 2015 and a price of $86.72 per share on March 19, 2015. Associate-1 was therefore predicting approximately a possible 15%-21% increase in the price of Auspex stock within one week.

profit from these trades of more than approximately $500,000.[8] Also, as set forth in records from Broker-1, on or about March 30, 2015, the CW sold the Auspex shares he acquired following the March 11 Phone Call, among other Auspex holdings, for a profit exceeding approximately $24,000.

**SARSHAR's Tips To Associate-2**

13. From my review of phone records for SEPEHR SARSHAR, a/k/a "Sep," the defendant, and Associate-2, brokerage records from three brokerage firms ("Broker-4" through "Broker-6"), and data from a cellular telephone obtained from Associate-2 as part of this investigation, I have learned the following:

a. On or about February 24, 2015, the same day Teva submitted to Auspex its non-binding proposal to acquire Auspex for a range of $85-$95 per share in an all cash transaction, between approximately 9:10 a.m. and 9:31 a.m., SARSHAR and Associate-2 exchanged text messages.[9]

---

[8] Associate-1 had also sold substantial quantities of Auspex stock in the week before the March 30 Press Release. In particular, from my review of records provided by Broker-1 and Broker-2, I have learned that, on or about March 20, 2015, Associate-1 sold approximately 11,440 shares of Auspex; on or about March 23, 2015, Associate-1 sold approximately 5,000 shares of Auspex; and on or about March 25, 2015, Associate-1 sold approximately 21,775 shares of Auspex. On or about March 24, 2015, Associate-1 purchased approximately 9,600 of Auspex. Likewise, the CW sold approximately 1050 shares of shares he previously held in Auspex stock on or about March 23 and 24, 2015. Despite these sales, both Associate-1 and the CW maintained substantial positions in Auspex and stood to profit from the Tender Offer based on these positions. From my interviews with the CW, and from my review of records from the Sarshar E-Mail Account and the CW iCloud Account, I have learned that Associate-1 borrowed, using Auspex shares as collateral, or sold Auspex shares, at least in part to facilitate the short sale of stock in another pharmaceutical company ("Company-A") which the two believed would decline due to certain patent litigation to which Company-A was then a party. In one text, for example, Associate-1 stated, in pertinent part, "I am borrowing from Aspx to short [Company-A]."

[9] While some of these messages appear to be friendly interchanges, the content of other messages during this brief period appears to have been deleted or is otherwise missing from Associate-2's cellular phone.

b. Immediately following these text messages, from approximately 9:38 a.m. through 10:29 a.m., Associate-2 called the administrator of her Section 401(k) plan (the "401(k) Administrator"). Records from a log maintained by the 401(k) Administrator reflect an entry for a phone call by Associate-2 on or about February 24, 2015, at approximately 9:51 a.m., regarding the process for moving funds from Associate-2's principal 401(k) Account to a Self-Directed Brokerage Account ("SDBA") with Broker-4, which was the securities broker for the plan.[10]

c. On or about February 24, 2015, at approximately 11:14 a.m., shortly after Associate-2's call with the 401(k) Administrator, Associate-2 sent a text message to SARSHAR stating "I can move my money over to my [Broker-4] acct." SARSHAR replied "Sounds good." Associate-2 replied "I'm going to send u a pic of my investments. I don't want to put all of it in the brokerage account. Tell me what I should sell," to which SARSHAR replied "ok." At approximately 11:20 a.m., Associate-2 sent SARSHAR a text message containing a picture of a computer screen listing Associate-2's then-current investments.

d. On or about the same day, February 24, 2015, beginning at approximately 11:13 a.m., and again from approximately 11:40 a.m. through 12:33 p.m., a friend and co-worker of Associate-2 (the "Co-Worker") called Broker-5, where the Co-Worker maintained a brokerage account. Later on or about February 24, 2015, a representative with Broker-5 sent an e-mail to the Co-Worker stating "Congrats on Auspex Pharmaceuticals. I look forward to seeing a screen shot of your account. All the best."

e. On or about February 25, 2015, at approximately 11:13 a.m., the Auspex CEO called SARSHAR for a call lasting approximately 5.5 minutes. Approximately 10 minutes later, at 11:23 a.m., SARSHAR sent a text message to Associate-2. Later that day, at approximately 2:42 p.m., Associate-2 called the 401(k) Administrator again for a call lasting approximately 25 minutes.

f. As reflected in a call log maintained by the 401(k) Administrator, minutes later at approximately 2:48 p.m., the Co-Worker called Broker-4—where, like Associate-2, the Co-Worker also maintained a brokerage account through the Section 401(k) Plan—

[10] A self-directed brokerage account inside a Section 401(k) plan provides the plan participant with the opportunity to trade investments that are not in the plan's official investment portfolio.

for assistance logging into her account. On or about the following day, February 26, 2015, SARSHAR sent a text message to Associate-2 asking "What did stock close at today?" Associate-2 replied "70.31." From publicly available historical price data, I have learned that on February 26, 2015, Auspex closed at $70.31 per share.

g. As reflected in records from Broker-4, on or about Friday, February 27, 2015, Associate-2 completed the process she began on February 24, 2015, liquidating various mutual fund holdings in her principal 401(k) Account and transferring approximately $52,450.98 from that account to an SDBA with Broker-4 ("Associate-2's SDBA"). That same day, at approximately 9:00 a.m., Associate-2 purchased 750 shares of Auspex at a price of approximately $67 per share in Associate-2's SDBA. Approximately five minutes later, at 9:05 a.m., Associate-2 sent a text message to SARSHAR.

h. On or about Tuesday, March 3, 2015, the Co-Worker liquidated various mutual fund holdings in her principal 401(k) Account and transferred approximately $68,156.44 from that account to an SDBA at Broker-4 (the "Co-Worker's SDBA"). The following day, March 4, 2015, the Co-Worker called the 401(k) Administrator regarding placing a trade online and told a representative that she would wait on buying Auspex stock until later that day.

i. As described above, on or about March 11, 2015, SARSHAR called the Auspex Conference Line for a call lasting nearly two hours, ending at 9:41 a.m. Later that morning, at approximately 11:53 a.m., SARSHAR called Associate-2. Associate-2 returned the call immediately and the two spoke at that time for approximately 15 minutes and then again at approximately 1:40 p.m. for approximately two minutes. Later that afternoon, at approximately 3:25 p.m., Associate-2 called a work phone number used by the Co-Worker for a call lasting approximately two minutes. The following morning, at approximately 9:31 a.m., the Co-Worker placed a limit order[11] in the Co-Worker's SDBA Account to purchase approximately 933 shares of Auspex at a price of $73 per share or less. An order for that number of shares and at that price was executed on or about March 23, 2015.

[11] A limit order is a type of order to purchase or sell a security at a specified price or better. For buy limit orders such as this one, the order will be executed only at the limit price or a lower one.

j. On or about March 25, 2015, at approximately 9:16 a.m., the Auspex CEO called SARSHAR and the two spoke for approximately 39 minutes. Shortly after this call ended, at approximately 10:19 a.m., SARSHAR called Associate-2. Six minutes later, at approximately 10:25 a.m., Associate-2 purchased an additional 75 shares of Auspex in another brokerage account at Broker-6 at the then market price of $65.41 per share. At approximately 10:24 a.m., Associate-2 sent a text message to SARSHAR stating "Just bought 75 shares." The same day the Co-Worker also purchased an additional 225 shares of Auspex in an account at Broker-5 at the then market price of $65.91 per share.

k. On or about March 27, 2015, the last day of trading before the March 30 Press Release, SARSHAR sent text messages to Associate-2 asking "[h]ow many shares do you have?" and "$75k investment?" to which Associate-2 responded "2075,"[12] which I believe refers to the number of shares held by Associate-2, and that this represented a $80,000 investment. SARSHAR then asked "How much from IRA account?" to which Associate-2 replied "50."

l. From records provided by Broker-4 and Broker-5, I have learned that, pursuant to the Tender Offer, on or about May 12, 2015, the Co-Worker tendered all 933 shares of Auspex held in the Co-Worker's SDBA Account with Broker-4 and, on or about April 20, 2015, the Co-Worker sold all of the Auspex shares in her account with Broker-5, including the approximately 225 shares she had purchased on March 25, 2015, yielding a total illicit profit of approximately $33,000. From records provided by Broker-4 and Broker-6, I have learned that, in or about early May 2015, pursuant to the tender offer, Associate-2 tendered all of the Auspex shares she held, including the approximately 825 shares she purchased as described above, yielding a total illicit profit of approximately $28,000.

**<u>SARSHAR' Tips to Associate-3</u>**

14. From my review of phone records for SEPEHR SARSHAR, a/k/a "Sep," the defendant, brokerage records provided by Broker-4, records from Teva, records from FINRA, and public SEC filings, I have learned the following:

a. On or about Friday, March 6, 2015, Auspex signed a confidentiality agreement with a potential suitor different from Teva. That same day, at approximately 11:50 a.m., SARSHAR called Associate-3 for a call lasting approximately two minutes. Shortly

[12] This figure includes shares Associate-2 acquired before the Company went public.

thereafter, between approximately 11:55 a.m. and 1:10 p.m., SARSHAR spoke by phone with Associate-3 for a total of approximately 75 minutes. By the time this call ended, the NASDAQ stock exchange had closed for the weekend. As noted below, SARSHAR falsely represented to FINRA that he had no contact with Associate-3 during this period of time.

b. Beginning the following Monday morning, March 9, 2015, at approximately 7:25 a.m., and continuing almost daily through March 23, 2015, Associate-3 purchased substantial quantities of Auspex stock totaling approximately 4,209 shares through three accounts he controlled with Broker-4.[13] From my review of records provided by Broker-4, I have learned that, pursuant to the Tender Offer, in or about May 2015, Associate-3 tendered all of these shares of Auspex stock, yielding an illicit profit of at least approximately $100,000.

**SARSHAR's Tips to Associate-4**

15. From my review of phone records for SEPEHR SARSHAR, a/k/a "Sep," the defendant, brokerage records from two brokerage firms ("Broker-7" and "Broker-8"), records provided by Teva, public SEC filings, and e-mails obtained in this investigation, I have learned the following:

a. On or about February 9 and 10, 2015, the Auspex CEO and other senior representatives of Auspex participated in in-person meetings in Israel with several of Teva's senior executives (the "February Israel Meetings"). At these meetings, among other things, Teva indicated that it had a strong interest in acquiring Auspex and intended to submit a proposal for the acquisition of Auspex following the completion of its ongoing internal due diligence process.

b. On or about February 10, 2015, the second day of the February Israel Meetings, at approximately 10:53 a.m., SARSHAR called Associate-4. At approximately 12:41 p.m., Associate-4 called SARSHAR and the two spoke for 15 minutes. This call ended approximately four minutes before the NASDAQ stock exchange closed. On or about the February 13, 2015, Associate-4 purchased approximately 9,000 shares of Auspex through his account with Broker-7.

[13] One of Associate-3's relatives also purchased Auspex following Associate-3's March 6, 2015 phone call with SARSHAR.

c. On or about February 17, 2015, the second day of the February 2015 Board Meeting described above, at approximately 8:31 a.m., SARSHAR called Associate-4. Associate-4 immediately returned the call and the two were connected for approximately one minute. Less than ten minutes later, at approximately 8:40 a.m., Associate-4 placed a limit order to buy 4,300 shares of Auspex at approximately $68.60 per share.

d. On or about the same day, February 17, 2015, Associate-4 traded phone calls with an individual SARSHAR later described to FINRA, through counsel, as Associate-4's domestic partner who resided in New York, New York (the "Domestic Partner"). The following day, February 18, 2015, Associate-4 wired approximately $50,000 to the Domestic Partner's brokerage account. That same day using these funds, the Domestic Partner purchased 701 shares of Auspex at approximately $71.21 per share, representing a total cost of approximately $50,000.

e. On or about March 4, 2015, at approximately 1:32 p.m. Eastern Standard Time ("EST"), Associate-4 called SARSHAR for a call lasting approximately 7 minutes. Minutes later, at approximately 1:48 p.m. EST, Associate-4 called the Domestic Partner for a call lasting approximately 2 minutes. The following day, March 5, 2015, the Domestic Partner transferred $10,000 to his brokerage account with Broker-8 and purchased 144 shares of Auspex at approximately $69.21 per share and a total cost of approximately $9,974.61.

f. On or about March 25, 2015, immediately following SARSHAR's call with the Auspex CEO described above, Associate-4 placed a limit order to buy 4,900 shares of Auspex at approximately $65.49 per share. On or about the same day, and approximately half an hour after Associate-4 purchased these shares, the Domestic Partner purchased an additional 76 shares of Auspex.

g. From records maintained by Broker-5, I have learned that Associate-4 tendered, pursuant to the Tender Offer, the 9,000 Auspex shares he purchased on or about February 13, 2015; sold on or about March 18, 2015 the approximately 4,300 Auspex shares he purchased on February 17, 2015; and sold on or about April 10, 2015 the approximately 4,900 shares he purchased on March 25, 2015, yielding a total illicit profit of approximately $550,000. From my review of brokerage records maintained by Broker-8, I have learned that, pursuant to the Tender Offer, the Domestic Partner tendered all but three of the Domestic Partner's shares, yielding

illicit profits on the 777 shares described above of approximately $22,000.[14]

**SARSHAR'S FALSE STATEMENTS IN FINRA'S INSIDER TRADING INQUIRY**

16. As part of its investigation into possible insider trading in Auspex stock in connection with the Tender Offer, on or about August 10, 2015, FINRA provided a law firm representing Auspex with a list of certain individuals who had traded in Auspex ahead of the March 30 Press Release (the "Trader List"). The Trader List included, among others, Associate-1, Associate-3, and Associate-4. FINRA requested that the Trader List be circulated to, among others, members of the Auspex Board of Directors, which included SEPEHR SARSHAR, a/k/a "Sep," the defendant, who were in turn asked to identify anyone on the Trader List they knew and to further provide certain information regarding their relationship with any such person including, among other things, "[a] synopsis of any contact which occurred during the period of February 2, 2015 through March 27, 2015"; and a "statement as to the circumstances under which any knowledge of the company's business activities may have been gained by the individual."

17. Following receipt of FINRA's inquiry, an attorney for Teva, which by that time had completed its acquisition of Auspex (the "Teva Attorney"), circulated the Trader List via e-mail to among others SEPEHR SARSHAR, a/k/a "Sep," the defendant. In this e-mail, the Teva Attorney specifically requested, among other things, that SARSHAR provide, for each person on the list he knew or had a relationship with, a "[s]ummary of contact between February 2 2015 and March 27, 2015" and information regarding "[c]ircumstances in which the person may have learned of Teva's or Auspex's business activities."

18. SEPEHR SARSHAR, a/k/a "Sep," the defendant, responded to this inquiry via e-mail on or about September 11, 2015 (the "September 11 E-Mail"). From my review of the September 11 E-Mail, I have learned that, as to Associate-1, SARSHAR stated:

a. He and Associate-1 had been friends since the mid-1980s and Associate-1 was an early investor in Auspex through certain companies.

---

[14] As part of this investigation, I have interviewed, among others, Associate-2 and Associate-4, both of whom denied receiving MNPI from SARSHAR. Based upon the facts set forth in this Complaint, I believe that these denials were false.

b. SARSHAR did not recall having contact with Associate-1 during the period from February 2, 2015 through March 27, 2015 (the "FINRA Lookback Period"). From my review of phone records, the Sarshar E-Mail Account, and the CW iCloud Account, as described above, I have learned that SARSHAR's statement to FINRA was false and that SARSHAR had substantial communications with Associate-1, including about the Tender Offer, during the FINRA Lookback Period.

c. SARSHAR provided no information in response to the request for circumstances under which any knowledge of Auspex's confidential business activities may have been gained by Associate-1. Based upon the facts set forth above, I believe SARSHAR purposefully omitted information in order to mislead FINRA.

19. From my review of the September 11 E-Mail, I have learned that, as to Associate-3, SEPEHR SARSHAR, a/k/a "Sep," the defendant, stated:

a. He and Associate-3 had been friends since the mid-2000s and Associate-3 was an investor in Auspex through a holding company.

b. SARSHAR did not recall having contact with Associate-3 during the FINRA Lookback Period. From my review of phone records, I have learned that this statement was false. In particular, as described above, on or about Friday, March 6, 2015, SARSHAR and Associate-3 exchanged phone calls which lasted a combined total of approximately 78 minutes.

c. SARSHAR provided no information in response to the request for circumstances under which any knowledge of Auspex's confidential business activities may have been gained by Associate-3. Based upon the facts set forth above, I believe SARSHAR purposefully omitted information in order to mislead FINRA.

20. From my review of the September 11 E-Mail, I have learned that, as to Associate-4, SEPEHR SARSHAR, a/k/a "Sep," the defendant, stated:

a. Associate-4 is, in fact a close family relation of SARSHAR's. Associate-4 was a founding investor of Auspex.

b. SARSHAR had phone and e-mail contact with Associate-4 to discuss personal matters and other common business investments during the FINRA Lookback Period but the discussions

never involved any topics related to Auspex. Based upon the facts set forth above, I believe this was false.

c. SARSHAR provided no information in response to the request for circumstances under which any knowledge of Auspex's confidential business activities may have been gained by Associate-4. Based upon the facts set forth above, I believe SARSHAR purposefully omitted information in order to mislead FINRA.

WHEREFORE, the deponent prays that an arrest warrant be issued for SEPEHR SARSHAR, a/k/a "Sep," the defendant, and that SARSHAR be imprisoned or bailed as the case may be.

/s/ Brandon Racz, by SDA

BRANDON RACZ
SPECIAL AGENT
FEDERAL BUREAU OF INVESTIGATION

Sworn to me through the transmission of this Complaint by reliable electronic means pursuant to Federal Rule of Criminal Procedure 4.1, this 21st day of August, 2020

Stewart D. Aaron

THE HONORABLE STEWART D. AARON
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK